**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CRYSTAL SUN, a minor suing** ) | |
| **by her mother and next friend,** ) | |
| **FENG ZHANG** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **CIVIL ACTION NO. _____** |
| **vs.** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **CHILDREN'S HOSPITAL OF** ) | |
| **ALABAMA, INC.; THE CHILDREN'S** ) | |
| **HOSPITAL OF ALABAMA;** ) | |
| **ALABAMA CHILDREN'S HEALTH** ) | |
| **SYSTEM, INC.; LEON SEBRING** ) | |
| **DURE IV, M.D.; PONGKIAT** ) | |
| **KANKIRAWATANA, M.D.;** ) | |
| **JAYNE MARIE NESS, M.D.;** ) | |
| **RICHARD STEVENS MARTIN, M.D.;** ) | |
| **and PEDIATRIC RADIOLOGY** ) | |
| **ASSOCIATES, P.C.,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

COME NOW the Plaintiffs, Crystal Sun, suing by her mother and next friend, Feng Zhang, and through counsel, and hereby state their causes of action and claims for relief against the Defendants as follows:

### PARTIES

1.     Plaintiff, Crystal Sun is a minor child (currently age 10) and the natural born daughter of Plaintiff Feng Zhang. Plaintiffs are citizens and residents of Nashville, Davidson County, Tennessee.

2.      Defendant, Children's Hospital of Alabama, Inc. is a corporate citizen of the State of Alabama and may receive service of process through its registered agent, Warren William Michael, Jr., 1600 Seventh Ave South, Birmingham, AL 35233.

3.      Defendant, The Children's Hospital of Alabama  is a corporate citizen of the State of Alabama and may receive service of process through its registered agent, Warren William Michael, Jr., 1600 Seventh Ave South, Birmingham, AL 35233.

4.      Defendant, Alabama Children's  Health System, Inc. is a corporate citizen of the State of Alabama and may receive service of process through its registered agent, James C. Dearth, 1600 7th Ave South, Birmingham, AL 35233.

5.      Defendant, Leon Sebring Dure IV, M.D. is a resident citizen of the State of Alabama, who may receive service of process at his place of business,  1600 Seventh Ave South, Birmingham, AL 35233, or alternatively, at his address, 4002 10th Ave South Birmingham, AL 35222-4218.

6.      Defendant Pongkiat Kankirawatana, M.D. is a resident citizen of the State of Alabama, who may receive service of process at his place of business,  1600 Seventh Ave South, Birmingham, AL 35233, or alternatively, at his address, 508 Lansdowne Place, Vestavia, AL 35226-3264.

7.      Defendant Jayne Marie Ness, M.D. is a resident citizen of the State of Alabama, who may receive service of process at her place of business,  1600 Seventh Ave South, Birmingham, AL 35233,  or alternatively, at her address, 4400 Clairmont Ave. South, Birmingham, AL 35222-3728.

8.      Defendant Richard Stevens Martin,  M.D. is a resident citizen of the State of Alabama, who may receive service of process at his place of business,  1600 Seventh

Ave South, Birmingham, AL, 35233, or alternatively, at 2000A Southbridge Parkway,

Suite 300, Birmingham, AL 35209-7718.

9.      Defendant, Pediatric Radiology Associates, P.C. is a corporate citizen of

the State of Alabama and may receive service of process through its registered agent,

Daniel W. Young, 1600 7th Ave South, Birmingham, AL 35233.

<h3 style="text-align:center">JURISDICTION AND VENUE</h3>

10.      Personal jurisdiction over each of the Defendants is proper because each

Defendant is a citizen of the State of Alabama and the tortious conduct of each

Defendant which gives rise to this cause of action took place in the State of Alabama.

11.      Pursuant to 28 U.S.C. §1332 subject matter jurisdiction is proper based

upon complete diversity of citizenship between Plaintiffs and Defendants and the amount

in controversy exceeds $75,000.00, exclusive of interests and costs.

12. Venue in this cause is proper in this Court pursuant to 28 U.S.C. § 1391.

<h3 style="text-align:center">FACTUAL BACKGROUND</h3>

13.      This action is brought to recover special and general damages arising from

serious bodily and personal injuries suffered by the minor Plaintiff, Crystal Sun, due to

the ordinary negligence, professional negligence and malpractice committed by

Defendants and their agents and employees while providing medical care and treatment

to Plaintiff Crystal Sun.

14.      Crystal Sun's cause of action is based upon the Alabama Medical Liability

Act (Ala. Code §§ 6-5-480 et. seq.) and the common law of Alabama concerning simple

or ordinary negligence.

15.     Crystal Sun was a minor child at the time she received the care at issue in this case and any applicable statute of limitations was therefore tolled by Ala. Code §§ 6-2-8 (subject to the four-year statute of repose set forth in Ala. Code §§ 6-5-482: four years from the date of the negligent act).

16.     The treatment at issue that Plaintiffs aver as actionable negligence commenced when Crystal Sun presented to the emergency room at Children's Hospital in Birmingham on June 13, 2007. Accordingly, Crystal Sun's case is timely filed.

17.     Crystal Sun was born in August of 2000 at Vanderbilt University Hospital in Nashville, Tennessee. Her parents are her mother, Feng Zhang, and her father, Yuehui Sun. On 9/5/2006 in Nashville, TN she fell at school and sustained a head injury. An EEG was performed and was read as normal. Her physicians at that time did not think that her fall was caused by a seizure and did not suggest giving an anti-epilepsy drug.

18.     In October 2006 Crystal Sun fell again at home and was seen by Dr. Eric Fenichel, a pediatric neurologist at Vanderbilt. Dr. Fenichel believed the falling was caused by a "drop attack." The fall was sudden (1 to 2 seconds) with no loss of consciousness. On 10/11/2006 Crystal Sun received an MRI at the Vanderbilt Children's Hospital. The study was normal. Because of the inherent danger of falling, Dr. Fenichel suggested giving Crystal Sun an anti-epilepsy drug, Keppra, at the lowest dosage for her weight by mouth. Keppra controlled the drop attacks.[1]

---

[1] Keppra (levetiracetam) is an anticonvulsant medication used to treat epilepsy. It was approved for use in adults by the FDA in 1999; "Keppra (levetiracetam) is indicated as adjunctive therapy in the treatment of partial onset seizures in adults with epilepsy." http://www.accessdata.fda.gov/drugsatfda_docs/label/1999/21035lbl.pdf.

19. In 2/2007 Crystal underwent a 24-hour EEG. No seizure spike was found, but slowness of the EEG existed. Crystal Sun's mother, Feng Zhang, spoke with Dr. Fenichel to see whether the slowness of EEG was caused by the drug she was on. Dr. Fenichel said, the drug might be causing the slowness on the EEG.

20. In 4/15/2007 the family moved to Birmingham, Alabama. On 6/13/2007 Crystal Sun fell at home after playing tennis. She was taken to the ER at Children's Hospital at Birmingham for the first time. Dr. Dure increased Keppra from 550 mg bid to 750 mg bid and gave an additional anti-epilepsy drug, Lamictal, to 100 mg bid. The doctors at Birmingham Children's Hospital failed to ask about the child's medical history that day. Crystal Sun's mother gave Crystal's medical records from Vanderbilt to

---

Scientifically, "[T]he mechanisms of action of levetiracetam appear to involve neuronal binding to synaptic vesicle protein 2A, inhibiting calcium release from intraneuronal stores, opposing the activity of negative modulators of GABA- and glycin-gated currents and inhibiting excessive synchronized activity between neurons. In addition, levetiracetam inhibits N-type calcium channels." Lyseng-Williamson KA., *Levetiracetam: a review of its use in epilepsy,* DRUGS, 011 MAR 5;71(4):489-514. http://www.ncbi.nlm.nih.gov/pubmed/21395360

Keppra's initial labeling noted: "Safety and effectiveness in patients below the age of 16 have not been established." *Id.*

On June 21, 2005 the FDA approved Keppra tablets and Keppra oral solutions for use in children; "Keppra® (levetiracetam) is indicated as adjunctive therapy in the treatment of partial onset seizures in adults and children 4 years of age and older with epilepsy." http://www.accessdata.fda.gov/drugsatfda_docs/label/2005/021035s040,021505s007lbl.pdf. The manufacturer and FDA noted the proper dosing (20 mg/kg daily dose) and that patients ≤ 20 kg should be dosed with oral solution:

**Pediatric Patients Ages 4 To <16 Years**
Treatment should be initiated with a daily dose of 20 mg/kg in 2 divided doses (10 mg/kg BID). The daily dose should be increased every 2 weeks by increments of 20 mg/kg to the recommended daily dose of 60 mg/kg (30 mg/kg BID). If a patient cannot tolerate a daily dose of 60 mg/kg, the daily dose may be reduced. In the clinical trial, the mean daily dose was 52 mg/kg. Patients with body weight ≤ 20 kg should be dosed with oral solution. Patients with body weight above 20 kg can be dosed with either tablets or oral solution.
http://www.accessdata.fda.gov/drugsatfda_docs/label/2005/021035s040,021505s007lbl.pdf

the treating physicians. Crystal's father, Yuehui Sun, who is a Chinese-trained physician, asked Dr. Dure whether it was safe to give her so many anti-epilepsy drugs. Dr. Dure only answered they were careful when giving kids the drugs.

21.     Crystal's weight was 20kg (44lbs). The maximum dosage of Keppra for Crystal should have been 600mg twice per day. Crystal received 750 mg of Keppra twice per day from 6/15/07 until 11/27/07. Moreover, she was prescribed 100 mg bid (2x per day) Lamictal as well. The family did not know why the physicians gave Crystal so many anti-epilepsy drugs.

22.     On 7/2/2007, Crystal went to see Dr. Williams for a follow-up exam. Dr. Williams carefully asked Crystal's medical history and also examined her. She was normal in all examinations on 7/2/07. Crystal's mother noted to Dr. Williams that after taking Lamictal from 6/14/07, Crystal was sleeping more, was fatigued and had head aches sometimes. Dr. Williams said it was caused by the side effects of the drugs. Dr. Williams noted that the first step of titration of Lamictal from 5 mg to 25 mg that Dr. Dure had ordered was too fast. Later, Ms. Zhang was also told by Dr. Anthony Kilroy, a neurologist at Vanderbilt Children's Hospital, that titration of Lamictal from 5mg to 25mg was too fast. Dr. Williams asked the family about inquiring to stop giving Crystal Lamictal. Feng Zhang, Crystal' s mother, e-mailed Dr. Dure to ask whether they should stop the Lamictal Dr. Dure stated that the Lamictal should not be stopped.

23.     From 6/14/07 to 11/16/07 Sun Crystal was not as active as before, sleeping more and fatigued after she was taking Lamictal from 6/14/07. In 8/07, her mother noticed she had poor handwriting and had poor balance walking Her handwriting before her medications handwriting had always been very good. Crystal Sun was still

going to school. Crystal's mother checked on the side effects of Lamictal and Keppra and discovered that these drugs can cause sleeping, fatigue, poor co-ordination and even ataxia.[2] She started to complain about the adverse effects of the medicines to Dr. Pongkiat Kankirawatana in the clinic office on 9/10/07, 11/15/07 and 11/26/07 on the phone and to Dr. Ness on 11/24/07, but her complaints were ignored and dismissed. It is of note that Crystal's mother, Feng Zhang, is a highly educated scientific researcher and in employed at Vanderbilt University as a research fellow.

24.     On 8/29/07 Crystal underwent an MRI at Children's Hospital ordered by Dr. Dure. Dr. Richard Martin, radiologist, reported the MRI was normal. In fact, as noted later, it was not normal: there was a small change in her brain stem. Dr. Pongkiat Kankirawatana did not read the MRI, and when Crystal's mother asked for the results from him on 9/10/07, she was told it was normal.

25.     On 9/10/2007, after leaving Dr. Williams (who had moved his practice), Crystal Sun was seen by the specialist Dr. Pongkiat Kankirawatana, who had just come back to work from Thailand. Feng Zhang told Dr. Pongkiat Kankirawatana her concerns

---

[2] Ataxia : "Wobbliness. Incoordination and unsteadiness due to the brain's failure to regulate the body's posture and regulate the strength and direction of limb movements. Ataxia is usually a consequence of disease in the brain, specifically in the cerebellum which lies beneath the back part of the cerebrum." http://www.medterms.com/script/main/art.asp?articlekey=2375. Ataxia is a known and disclosed (in the prescribing information/label) adverse side effect of Keppra:

> A total of 3.4% of Keppra® treated patients experienced coordination difficulties, (reported as either ataxia, abnormal gait, or incoordination) compared to 1.6% of placebo patients. A total of 0.4% of patients in controlled trials discontinued Keppra® treatment due to ataxia, compared to 0% of placebo patients. In 0.7% of treated patients and in 0.2% of placebo patients the dose was reduced due to coordination difficulties, while one of the treated patients was hospitalized due to worsening of pre-existing ataxia. http://www.accessdata.fda.gov/drugsatfda_docs/label/2005/021035s040,021505s007lbl.pdf.

Ataxia is also reported in the peer-reviewed medical literature as a symptom of Keppra (levetiracetam) overdose. Chayasirisobhon S, et al.., *Acute levetiracetam overdose presented with mild adverse events,* ACTA NEUROL TAIWAN. 2010 Dec;19(4):292-5.

and observations of Crystal's change after taking the anti-epilepsy drugs, including handwriting, and difficulty to do balance walking. Dr. Pongkiat Kankirawatana did not put any of her complaints of the potential drug side effects in the records. Dr. Pongkiat Kankirawatana tested Crystal's handwriting by drawing a circle. Crystal had difficulty drawing the circle. Dr. Pongkiat Kankirawatana found her behavior abnormal, but he still kept her on the same medicines at the same levels.

26.     Crystal Sun's  mother again asked about the results of the MRI that was performed on 8/29/07. Dr. Pongkiat Kankirawatana said it was normal even though he did not read the MRI.  He scheduled her for an EEG but no more MRIs were scheduled for Crystal even though he found Crystal's  behavior abnormal.

27.     On 10/17/07,  a 24-hour EEG was performed. Between 10/17/07 and 11/10/07 Ms. Zhang called Dr. Pongkiat Kankirawatana's office several times to find out the results of 24- hour EEG. She also wanted to schedule an appointment to see Dr. Pongkiat Kankirawatana's. She did not receive the 24 hour EEG result until November 9th. It was also very difficult to schedule an appointment to see Dr. Pongkiat Kankirawatana. The family learned later he had been in Thailand again and did not return until 11/15/07.

28.     On 11/2/07 Crystal Sun was taken by her father to the pediatric clinic, Midtown Pediatrics (because Dr. Pongkiat Kankirawatana was not available). She saw Dr. Thiele, Crystal's primary care physician,  with a complaint of severe reaction to meds with symptoms of choking liquids and drooling. Dr. McGrath was paged by the pediatrician's office and was asked whether the med levels needed to be checked. He said

no levels needed checking and  Crystal Sun was kept on Lamictal 25 mg per 2x day; Keppra 750 mg.  2x per day.

29.     On 11/15/07 Dr. Pongkiat Kankirawatana came back to work. Dr. Pongkiat Kankirawatana called Ms. Zhang at her office and told her Crystal's swallow test was normal. Ms. Zhang again complained about the adverse effects of the medications. She noticed that Crystal had nighttime drooling that began sometime in November and she would bite her tongue when she was sleeping. Dr. Pongkiat Kankirawatana agreed to replace Lamictal with Zongram. He said the nurse would contact her for how to replace it.

30.     On 11/19/07 Crystal's mother saw Crystal choke when she drank water. She called Dr. Pongkiat Kankirawatana's office and asked for a walk-in appointment. In Dr. Pongkiat Kankirawatana's  office, Crystal was asked to walk in the hallway. She did well by herself without help. Crystal was also tested by drinking a cup of water. She did it without choking; however this was not noted in the record. No neurological examination was performed.  Dr. Pongkiat Kankirawatana scheduled her for an MRI. In the office Dr. Pongkiat Kankirawatana still stated that Crystal's swallowing was normal and drew a picture on a paper towel to explain this.

31.     Ms. Zhang started to titrate down the Lamictal while simultaneously beginning Zongran as instructed by Dr. Pongkiat Kankirawatana. Completing  downward dosing to a  zero amount of Lamictal took two weeks.

32.     On 11/23/07 the family went Thanksgiving shopping at the mall, but Ms. Zhang noticed that Crystal was different. She just walked by herself for a while, but then

was unable to walk by herself and just sat on the floor. She choked trying to eat cookies. The parents decided to take Crystal to the ER at Children's Hospital.

33.    The ER doctor asked her to walk by herself which she was able to do. Crystal was admitted to the hospital. Crystal was taking Keppra, titrated Lamictal and Zongran by oral route. That night Crystal still went to the bathroom by herself. She had no respiratory problems.

34.    On 11/24/07, Crystal still fed herself and went to the bathroom by herself. Ms. Zhang complained about the adverse effects of the Lamictal to the early morning attending pediatric neurologist Dr. Jayne Ness. Ms. Zhang, as a mother, had also watched her change after she had started taking Lamictal. Dr. Ness disagreed. Ms. Zhang asked Dr. Ness why she disagreed. Dr. Ness told her she had a little girl patient who had taken Lamictal and never had these kinds of side effects. Dr. Ness said she was very sure that Crystal had a degenerative disease, since her partner had seen Crystal on 6/14/07 with Dr. Dure and at that time Crystal's condition had been better. Dr. Ness chose to stop Lamictal after a last dose of 25 mg on 11/24, which was several days earlier than Mrs. Zhang was told by Dr. Pongkiat Kankirawatana. Dr. Ness ordered Keppra by IV (750 mg bid) even though at that time Crystal could still eat by herself. Dr. Ness also did not tell the parents that the IV Keppra had not been approved by the FDA.[3] The chart shows that

_____

[3] Keppra injection was approved by the FDA on July 31, 2006 for use in adult patients:

> "KEPPRA injection is indicated as adjunctive therapy in the treatment of partial onset seizures in adults with epilepsy.KEPPRA injection is an alternative for patients when oral administration is temporarily not feasible. . . Safety and effectiveness of KEPPRA injection in patients below the age of 16 years have not been established."
> http://www.accessdata.fda.gov/drugsatfda_docs/label/2006/021872lbl.pdf

On September 12, 2007 the FDA revised the approved labeling for Keppra injection:

on 11/24/ 07 Keppra IV 750 mg was ordered q 12 hours. IV Keppra was administered

750 mg and Crystal received three doses during 36 hours.  This was in well in excess of

the manufacturer's recommended dose even for adult patients (500 mg twice a day).[4] The

hospital's medical records were incorrectly changed  from IV to oral. In addition, Dr.

Pongkiat Kankirawatana sent to the FDA  an FDA "MedWatch"  Form 3500 adverse

reaction report on January 8, 2008 (attached as **Exhibit 1**)[5] that notes Crystal's

development of ataxia progressing to a brain lesion associated with Keppra suspension

750 mg (IV)[6].

     35.     On 11/25/07, Crystal Sun  was getting worse in her activity capabilities

and that morning, she was unable to walk by herself when Dr. Ness asked her to do, but

she was still able to walk with help. When Dr. Ness asked her whether she wanted to stay

---

"KEPPRA injection is an antiepileptic drug indicated for:
**Partial Onset Seizures (1.1)**
•     Adjunct therapy in adults (≥16 years of age) when oral administration of
KEPPRA is temporarily not feasible.
**Myoclonic Seizures in Patients with Juvenile Myoclonic Epilepsy (1.2)**
•     Adjunct therapy in adults (≥16 years of age) with juvenile myoclonic
epilepsy when oral administration of KEPPRA is temporarily not feasible.
. . .
Safety and effectiveness of KEPPRA injection in patients below the age of 16
years have not been established."

http://www.accessdata.fda.gov/drugsatfda_docs/label/2007/021872s002s003lbl.p
df

[4] "Treatment should be initiated with a daily dose of 1000 mg/day, given as twice-daily dosing
(500 mg twice daily)."
http://www.accessdata.fda.gov/drugsatfda_docs/label/2007/021872s002s003lbl.pdf

[5] Handwritten entries are Ms. Zhang's and are not a part of the original form submitted to the
FDA. This is Plaintiffs' only copy.
[6] Lamictal was not mentioned in the Med Watch report and the report incorrectly states that
Crystal Sun received "one dose" of IV Keppra; however she received *three* doses of 750 mg IV
Keppra within 36 hours.

in the hospital or go home, Crystal asked to go home. The family went home from the hospital in the afternoon.

36.     On 11/26/07, Crystal was able to eat but could not walk by herself. She had to be helped to the bathroom and with bathing. That night, Dr. Pongkiat Kankirawatana called the family and asked them to go back to the hospital. Ms. Zhang mentioned the adverse effect of Keppra and anti epilepsy drugs again. Dr. Pongkiat Kankirawatana said at first he did not think Keppra had this kind of effect. Then Dr. Pongkiat Kankirawatana said if Keppra had this kind of effect, it was not with oral but with IV. Ms. Zhang then informed Dr. Pongkiat Kankirawatana, that, in fact, Crystal had been administrated Keppra by IV when she was in the hospital, as ordered by Dr. Ness.

37.     On 11/27/07 Crystal was taken back to the hospital. Crystal needed help to walk and stand. She could not walk by herself without help Ms. Zhang asked Dr. Pongkiat Kankirawatana to hold Keppra after Ms. Zhang had a conversation with him on the night of 11/26/07. Dr. Pongkiat Kankirawatana did not say anything and stopped giving Crystal Keppra.

38.     On 11/28/07, Crystal had severe ataxia. She could not stand up and required the help of her parents when she went to the bathroom that night. On 11/29/07 (2:30 am) her mother found that Crystal had problems breathing. She told the nurse and Crystal was given oxygen. Crystal had never had breathing problems before even on the day she presented to the ER (11/23). Later that day, when she had general anesthesia for an MRI, she stopped breathing, and had to be ventilated. At this time a steroid was administered. The MRI result showed that Crystal had a large brain stem lesion in the same area of the brain that had a small area of damage on an earlier MRI (8/29/07). The

physicians went back to see her MRI image of 8/29/07 and found a small abnormality of the brain stem at that time, which corresponded to the time it was noticed she had a change in handwriting.

39.     From 11/29/07 to 12/11/07, Crystal had improvement during the time of the steroid treatment. On December 6, 2007 a muscle biopsy was performed and test resulted showed no ragged red fibers. From 12/12/07 to 12/15/07 the steroid treatment was stopped and Crystal's condition got worse, she lost consciousness, her eyes were opening/closing uncontrollably for two days with fixed eyesight. A 24- hour EEG was performed at PICU and no seizure spikes were found.

40.     The family had a meeting when Dr. McGrath was the attending neurologist in the PICU and he told the parents (w/ PICU attending present, Dr. Margaret Winkler,  and a social worker Elaine present) that the muscle biopsy showed no ragged red fibers indicating a 90% probability Crystal did not have MERRF (Myoclonic Epilepsy with Ragged Red Fibers). The family requested a transfer to Boston Children's Hospital seeking a second opinion on diagnosis but were dissuaded and told that her ventilator status prevented transfer.

41.     From 12/16/07-12/29/07, Crystal enjoyed a recovery that included consciousness, smiling, responding, waving, talking in brief amounts, sitting in a wheelchair for a few hours per day.

42.     On 12/18/07, Dr. Pongkiat Kankirawatana  was the attending with the resident Dr. Crystal Palmatier and the clinical fellow Dr. Amy Willis Amara. He told them that Dr. Alan Percy (the Director of the Division of Child Neurology at UAB from 1992 through 2003), a highly recognized authority on Rett syndrome and inherited

neurometabolic disorders who has been involved in many leadership positions related to clinical neurosciences and the study of rare disease, disagreed with the diagnosis that Crystal had a degenerative disease. The treating physicians then decided to search whether an infectious agent may cause the problems Crystal was having.

43.     On 12/23/07, Crystal was transferred from PICU to the pulmonary care unit.

44.     On 12/27/07, Crystal's father asked Dr. Dure (director of the group) why Dr. Ness had given Crystal an overdose of Keppra by IV injection on 11/24/07 and 11/25/07 although it had not been approved by the FDA and there was no need or reason need to give Crystal Keppra by IV since Crystal was able to feed herself at that time. Dr. Ness had not told the family that the Keppra IV injection has not been approved by the FDA. The parents found out by calling the drug company later. Dr. Dure said it is ok to use it in clinic sometimes even it has not been approved by the FDA, but Dr. Ness should discuss it with the parents and get permission from the parents. This had not been done.

45.     On 12/29/07, all lab tests results, including all metabolic profile screening in blood, urine and CSF were normal or unremarkable. The muscle biopsy test was negative for red ragged fibers. The only positive test result was that the blood and spinal fluid revealed Mycoplasma infection by PCR (which was later found to be a false positive test). A treatment of Levaquin was begun, followed by Chloremphenicol. Crystal also did not have other organ problems (no hearing loss; no optic atrophy; no growth retardation; no cardiomyopathy; no liver or kidney disease, etc.). The absence of these problems indicated no mitochrondial disease.

46.     Because of pancreatitis, Crystal took a turn for the worse and stopped talking and had limited consciousness. Crystal developed GI bleeding and needed to a transfusion. On 1/4/08 Crystal was once again given steroids in high dosage, along with immunoglobulins by the pulmonary specialist Dr. Markris. Crystal had an MRI that day as well which showed no significant changes to the area of brain stem injury.

47.     On 1/7/08 Crystal stopped talking and was very sick. She moved both of her hands. At first, the doctors thought it was caused by seizure and gave her another anti-epilepsy drug Depacon. Later Dr. Reddy told Feng Zhang it was not seizure; it was fighting by Crystal. The EEG also did not show the seizure spikes.

48.     On 1/15/08, Crystal was diagnosed with pancreatitis and shock and was transferred to PICU again.

49.     On 1/18/08, in the afternoon, the parents were asked to have a meeting with Dr. Dure, Dr. Clancy (the pulmonary doctor), the fellow Dr. Amy Amara, and the social worker in the division of pulmonology. Dr. Dure told the parents that the mitochondrial mutation test showed that Crystal had a point mutation at mitochondrial DNA position 8443, which causes a tRNA lysine change by PCR. Then Dr. Dure said that this point mutation is informative and shows that Crystal has myoclonic epilepsy and mitochondrial red ragged fibers disease (MERRF). Dr. Dure also stated that her pancreatitis was related to the MERRF metabolic disorder. These statements/diagnoses were not correct. Crystal completely recovered from her pancreatitis which was medication related. In the meeting, Dr. Clancy said Crystal's clinical manifestations "fit" the MERRF diagnosis. Significantly, the physicians at Children's Hospital never called in

a genetic disease specialist and wrongly latched onto the MERRF "diagnosis" merely because she carried the MERRF point mutation.

50.      Plaintiffs do not deny that Crystal has the MERRF A8344G point mutation. However, the point mutation does not confirm MERRF disease. Many people have this mutation in their mitochondrial DNA, but they are asymptomatic – the situation in Crystal's case. Her point mutation in her lymphocyte is a null or silent mutation. The family obtained an expert opinion from a pediatric neurosurgery expert and a pediatric neuroradiology expert at the University of California at San Francisco who concluded after a group review meeting that Crystal's injuries and illness were *not* likely from a metabolic disorder (MERRF) because: she was not sick enough for metabolic disease; it was not likely an infection since her CSF was too benign. More likely, Crystal's brain stem injury was caused by the *toxic effects* of the medications Keppra and Lamictal given *in overdose*. Toxic accumulation of Keppra and Lamictal serum concentration levels causing neurotoxicity and brain encephalopathy have been well reported in the peer-reviewed literature.[7]

- [7] Vulliemoz S, et al.., *Levetiracetam* [Keppra] *accumulation in renal failure causing myoclonic encephalopathy with triphasic waves,* SEIZURE. 2009 Jun;18(5):376-8. Epub 2009 Feb 7 ("We describe the case of encephalopathy with triphasic waves concomitant with levetiracetam accumulation in a patient with chronic renal failure. . . Other causes of metabolic encephalopathy were excluded.")*;*
- Chayasirisobhon S, et al., *Acute levetiracetam overdose presented with mild adverse events,* ACTA NEUROL TAIWAN. 2010 Dec;19(4):292-5 ("Overdose of Levetiracetam may produce neurotoxicity.");
- *Antiepileptic drug-induced encephalopathy,* FORTSCHR NEUROL PSYCHIATR. 2010 Oct;78(10):590-8. Epub 2010 Oct 6 (" . . . ADE [antiepileptic drug-induced encephalopathy] has been described after the intake of vigabatrine, lamotrigine [Lamictal] und topiramate.";
- Burneo JG et al., *Neurotoxicity following addition of intravenous valproate to lamotrigine therapy*, NEUROLOGY. 2003 Jun 24;60(12):1991-2 ("Neurotoxicity was likely related to elevated serum LTG [Lamictal] levels");
- Perucca E. *Overtreatment in epilepsy: adverse consequences and mechanisms*, EPILEPSY RES. 2002 Nov;52(1):25-33 ("Overtreatment is not uncommon in patients taking

antiepileptic drugs, and it may occur in many forms and with a variety of mechanisms. Long-term use (or continuation) of anticonvulsant therapy in situations where it is not indicated (e.g. in children with simple febrile seizures, or in non-epileptic seizure-free patients who underwent brain surgery) constitutes a blatant case of overtreatment. . . While pharmacokinetic interactions are somewhat predictable and can be minimized or controlled by monitoring serum drug concentrations and/or dose adjustment, pharmacodynamic interactions leading to enhanced neurotoxicity (as seen, for example, in some patients given a combination of lamotrigine and carbamazepine) can only be identified by careful clinical observation.");

- Pricone MG, *Postmortem investigation of lamotrigine concentrations*, J FORENSIC SCI. 2000 Jan;45(1):11-5 ("Lamotrigine has also been shown to cause encephalopathy and thus neurotoxicity.");

- Luszczki JJ, *Levetiracetam selectively potentiates the acute neurotoxic effects of topiramate and carbamazepine in the rotarod test in mice,* EUR NEUROPSYCHOPHARMACOL. 2005 Dec;15(6):609-16 ("The effect of levetiracetam (LEV) on the acute neurotoxic profiles of various antiepileptic drugs. . .was evaluated . . these data support both experimental and clinical published data advocating that LEV may interact with some AEDs by pharmacodynamic mechanisms."

- KA Kennedy, *Neurotoxic Effects of Pharmaceutical Agents III: Neurological Agents,* book chapter (32) at p. 365 in Dobbs, M. CLINICAL NEUROTOXICOLOGY: SYNDROMES, SUBSTANCES, ENVIRONMENTS (2009) ("adverse neurological events....according to three major clinical trials [of Levetiracetam] . . . were dose dependent.").

- G. Zaccara*, Adverse motor effects induced by antiepileptic drugs,* EPILEPTIC DISORDERS. Volume 6, Number 3, 153-68, September 2004 ("Adverse drug reactions. . . are usually predictble, dose-dependent"… "Vestibulocerebellar and brain stem dysfunction: Many drugs may determine brainstem and\or cerebellar dysfunction resulting in disorders of upright stance and gait (ataxia, incoordination, dizziness, and vertigo), and ocular motricity (diplopia and oscillopsia)." [In discussing a "traditional" anti epilepsy drug (AED) phenytoin] "two main findings suggest that toxic PHT doses may cause cerebellar atrophy. PHT‐induced cerebellar degeneration was also reported in nonepileptic patients  and in some patients, neuroradiological investigations performed pre‐ and post‐ PHT intoxication showed that cerebellar atrophy appeared after the episode of drug intoxication. The mechanism of this peculiar PHT‐induced toxic effect is still debated. Owing to its dose‐dependent kinetics, PHT can slowly accumulate in the brain, reaching very high concentrations that persists for a long time after drug withdrawal. In addition, PHT‐induced chronic ataxia and cerebellar atrophy may predispose patients to CBZ neurotoxicity, which may persist years after the episode of intoxication." The authors then discuss "new" AED drugs (including Keppra (levetiracetam) and Lamictal (lamotrigine) and state: "In several double‐blind or open studies, patients with newly diagnosed epilepsy were randomised to monotherapy with a new or a traditional AED. In none of these studies were dizziness, ataxia and diplopia significantly less frequent in patients taking the new drug, although favourable trends were observed in some of them. . . LTG [lamotrigine] and OXC [oxcarbazepine] seem to cause vestibulocerebellar and brain stem impairment more often than other new AEDs.. . metanalysis showed that some of the new drugs (i.e. LTG) more selectively induce vestibulocerebellar adverse effects and are not sedative."

- RE Schuman, *Seizure-Inducing Drugs Used for the Critically Ill* , CURRENT CLINICAL NEUROLOGY, 2005, 261-290, DOI: 10.1007/978 "[W]ith AED  [anti epilepsy drug]

51.     Plaintiffs aver that to a reasonable degree of medical probability, Crystal

Sun's  brain stem injury  was caused by the neurotoxic effects of the medications Keppra

and Lamictal *given in overdose*. In fact, the potential for a neurotoxic cause of her

injuries was noted by the Children's Hospital radiologist who read the December 3, 2007

MRI.[8]

52.     On 1/19/08 Crystal had seizures every five minutes and time it lasted more

than five minutes (status epilepticus). The parents had never seen her have typical grand

overdose, a neurotoxicity syndrome has been described, including seizure exacerbation, coma, and encephalopathy."

- *Cf.* M. Iivanainen et al., *Cerebellar Atrophy in Phenytoin-Treated Mentally Retarded Epileptics,* EPILEPSIA, Volume 18, Issue 3, pages 375–386, September 1977 (AED drug Dilantin --"Phenytoin intoxication was diagnosed retrospectively in 73 patients (56%), of whom 18 had persistent loss of locomotion. The mean duration of phenytoin intoxication until locomotion was lost was $22.8 \pm 23.6$ months. There was a temporal relationship between the high serum level of phenytoin and the loss of locomotion. The degree of brain atrophy in the posterior fossa was most severe in these 18 patients with severe phenytoin intoxication.").

[8] "Stable area of signal abnormality in the posterior aspect of the medulla. The *symmetry* of the abnormality would argue against a syringobulbia from any number of causes. The lack of mass-effect and enhancement would also argue against neoplasm. It is possible that the area of abnormality ['signal abnormality seen in the posterior aspect of the medulla to the right and left of midline which appear symmetric'] could be due to infectious type process or perhaps a *toxic*/metabolic type process considering the symmetry that is present.  Acute disseminated encephalomyelitis and multiple sclerosis would be other considerations." *MRI of the Brain*, 12/3/07, Children's Hospital, Dr. Eric Howell (emphasis supplied)

- The *symmetrical* nature of Crystal Sun's brain lesion is consistent with a toxic drug-induced brain stem lesion . *See e.g.,* Sargon Ziyeh et al., *Valproate-induced Encephalopathy: Assessment with MRImaging and IH MR SpectroscopyI,* EPILEPSIA, Vol. 43. No.9. 2002;  ("MRI images showed prominent bilateral *symmetric*  hyperintense signal of the cerebellar white matter. . . MRI showed a metabolic-toxic lesion pattern with bilateral T2 -hyperintense lesions in the cerebellar white matter and in the globus pallidus. MRI spectroscopic findings were indistinguishable from hepatic encephalopathy with severe depletion of myoinositol and choline and with glutamine excess. N-Acetylaspartate levels were moderately decreased. Quantitative MRS gave detailed insight into alterations of brain metabolism in VPA [Depacon, an anti-epilepsy drug]-induced encephalopathy."); E. Kim et al., *MR Imaging of Metronidazole-Induced Encephalopathy: Lesion Distribution and Diffusion-Weighted Imaging Findings*, AMERICAN JOURNAL OF NEURORADIOLOGY 28:1652-1658, October 2007; Takahashi H, et al., *Salazosulfapyridine-induced encephalopathy with symmetrical lesions in the basal ganglia and thalami*, INTERN MED. 2006;45(15):927-9. Epub 2006 Sep 1.

mal seizures before. When she was in the hospital from 11/27/07 to 1/19/08 the doctors did EEGs three or four times including one 24 hour EEG in the PICU for her. No seizure spike wave was found in her EEG. She was given the sedation Ativan routinely to control the seizures. The status epilepticus that Crystal had was caused by the abrupt withdrawal of all epilepsy drugs by Dr. Dure. Status epilepticus can be life threatening and this necessitated even more anti epilepsy drugs.

53.     On 1/21/08 Dr. Phan was the attending. Ms. Zhang asked Dr. Phan why Crystal did not have seizures after Dr. Dure stopped the anti-epilepsy drugs on 1/16/08 but was now having  status epilepticus. Dr. Phan said that the half-life of the anti-epilepsy drugs is several days.

54.     On 1/22/08 the parents asked to have Crystal transferred back to Nashville after a respiratory therapist (Jennify) told the parents that a transport could occur to another hospital even though Crystal was still on a ventilator.

55.     Prior to June 13, 2007 Crystal Sun was a normal happy child when she went to Defendants' hospital with a mild myoclonic seizure disorder. Six months later, she was transferred to the Vanderbilt Children's Hospital by helicopter with life-threatening status epilepticus seizures that had not been controlled, on a ventilator machine to support her breathing,  in a deep coma with permanent paralysis in a persistent vegetative condition which is permanent,

56.     Currently Crystal Sun is without seizures (for almost three years) with no epilepsy medications. She has not been hospitalized for nearly three years. She has none of the  indications of a progressive or serious metabolic disorder. She completely recovered from her pancreatitis, bone marrow toxicity and liver damage (that were

caused by her medicines). In fact she has taken no prescribed medication for almost three years.

57. Nevertheless, she is gravely injured. She is bed-ridden, ventilator dependent and is unable to speak or eat by herself. She has a G-tube in her stomach for feeding. She cannot sit without support. She requires 24-hour care and assistance. Crystal Sun is devastatingly injured as a result of the neurotoxic effects of the drug-induced brain stem lesion and abrupt withdrawal of all anti-epilepsy drugs caused by Defendants' acts and omissions. Her condition and symptoms are the result of a tragic case of overdose and treatment outside the standard of care.

## COUNT I

### NEGLIGENCE AND MEDICAL MALPRACTICE
(Defendants Children's Hospital of Alabama, Inc.; The Children's Hospital of Alabama and Alabama Children's Health System, Inc.)

58. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

59. At all times complained of herein, Defendants Children's Hospital of Alabama, Inc., The Children's Hospital of Alabama and Alabama Children's Health System, Inc. (hereafter collectively referred to as "the hospital defendants") were engaged in the business of offering medical care and services to the public. The hospital defendants employed on their staff various physicians, nurses, and other personnel, including (without limitation) Drs. Dure, Kankirawatana, Ness, Martin and McGrath and operated by and through agents, employees and servants, acting within the course and scope of their employment and in furtherance of the business of the hospital defendants.

60. During the course of Plaintiff Crystal Sun's treatment, as set forth above, at Children's Hospital the hospital defendants by through employees, agents and servants, committed multiple errors amounting to negligence such as would constitute unreasonable and unacceptable medical practices at the time. These breaches of the applicable standard of care proximately caused Plaintiff Crystal Sun to suffer, among other things, the development of a brain stem lesion, paralysis, loss of bodily functions, resulting medical and surgical interventions, significant medical expenses, a loss of income, and significant past and future mental and physical pain and suffering. Defendants' negligence increased the risk of harm to Plaintiff Crystal Sun by reducing her chance of survival and life expectancy.

61. Crystal Sun and her parents did not choose or select the physicians who treated Crystal Sun and the hospital defendants are therefore liable for the acts and omissions of the treating physicians (individual defendants herein and any other treating physician employees or agents of the hospital) and for the acts and omissions of all agents, employees and servants who cared for Crystal Sun under theories of employment, *respondeat superior*, agency, apparent agency, and ostensible authority.

62. Specifically, among other negligent acts and/or omissions, the hospital defendants, independently (as primary negligence and breach of duty) and/or through employees, agents and/or servants, breached and/or deviated from the applicable standard of care by:

a. failing to furnish properly trained and qualified physicians, nurses, medical technicians and/or other skilled personnel to attend to Plaintiff Crystal Sun;

b.      failing to furnish a specialist or specialists in genetic medicine to rule out MERFF disease;

c.      negligently prescribing  Keppra;

d.      negligently prescribing Lamictal;

e.      negligently overdosing Crystal Sun with the  Keppra and Lamictal medications;

f.      failing to work up and diagnose Crystal Sun's neurological symptoms;

g.      failing to diagnose a brain stem lesion;

h.      failing to properly  treat a brain stem lesion;

i.      failing to perform a proper  and  examination and work-up of Plaintiff Crystal Sun  given the nature of Plaintiffs complaints;

j.      negligently failing to advise, inform, or in any way discuss with Plaintiff Crystal Sun's parents the risks of Keppra and Lamictal as prescribed and given (lack of informed consent);

k.      negligently failing to follow-up and treat  Plaintiff  Crystal Sun concerning her adverse reaction to Keppra and Lamictal;

l.      negligently failing to sufficiently investigate and evaluate the cause of  Plaintiff Crystal Sun's symptoms and complaints;

m.      negligently (and abruptly) withdrawing all of the anti  epilepsy drugs without replacing other anti-epliepsy drugs;

n.      negligently misreading  the MRI on 8/29/07;

o.    negligent testing in connection with a mycoplasma infection in

blood and CSF;

p.    otherwise, in general,  negligently failing to comply with the

standard of care applicable to the examination and treatment of Plaintiff

Crystal Sun.

63.    In light of the above, the hospital defendants are liable for, and Plaintiffs

hereby seek to collect, all special and general damages stemming from or associated with

the injuries and damages described above including, without limitation, all of Plaintiff

Crystal Sun's past and future medical expenses, past and future loss of income, physical

disability, permanent scarring and disfigurement, past and future physical and mental

pain and suffering, past and future anguish and emotional distress.

## COUNT II

### NEGLIGENCE AND MEDICAL MALPRACTICE
(Defendants Dure,  Kankirawatana, Ness,  Martin
and Pediatric Radiology Associates, P.C )

64.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set

forth herein.

65.    When Defendants Drs. Dure,  Kankirawatana, Ness and Martin (hereafter

"the physician defendants")  rendered the above-described medical care to Plaintiff

Crystal Sun, there was a doctor-patient relationship between the physician defendants and

Plaintiff  Crystal Sun which gave rise to a legal duty of care to conform  their  medical

practice and treatment of Plaintiff  Crystal Sun to that standard of care which, under

similar circumstances, is ordinarily employed by like physicians. When Dr. Martin

rendered the above-described care he acted in the course and scope of his employment as

an officer, agent or employee of Pediatric Radiology Associates, P.C.. Pediatric Radiology Associates, P.C. is therefore liable for the acts and omissions of Dr. Martin under principles of agency, *respondeat superior*, employment, ostensible authority and apparent authority.

66.  In connection with the medical care provided to Plaintiff Crystal Sun the physician defendants deviated from that standard of care which, under similar conditions and like circumstances, is ordinarily employed by medical doctors practicing in the field(s) of pediatrics and pediatric neurology. These breaches of the applicable standard of care proximately caused Plaintiff Crystal Sun to suffer, among other things, the development of a brain stem lesion, paralysis, loss of bodily functions resulting medical and surgical interventions, significant medical expenses, loss of income, and significant past and future mental and physical pain and suffering. Defendants' negligence increased the risk of harm to Plaintiff Crystal Sun by reducing her chance of survival and life expectancy.

67.  Specifically, among other negligent acts and/or omissions, the physician defendants breached and/or deviated from the applicable standard(s) of care by:

a.  negligently prescribing Keppra;

b.  negligently prescribing Lamictal;

c.  negligently overdosing Crystal Sun with the Keppra and Lamictal medications;

d.  negligently failing to realize that Keppra and Lamictal were causing adverse effect to the patient; failing to work up and diagnose Crystal Sun's neurological symptoms;

e.      failing to diagnose a brain stem lesion;

f.      failing to properly  treat a brain stem lesion;

g.      failing to perform a proper  and  examination and work-up of Plaintiff Crystal Sun  given the nature of Plaintiffs complaints;

h.      negligently failing to advise, inform, or in any way discuss with Plaintiff Crystal Sun's parents the risks of Keppra and Lamictal as prescribed and given (lack of informed consent);

i.      negligently failing to follow-up and treat  Plaintiff  Crystal Sun concerning her adverse reaction to Keppra and Lamictal;

j.      negligently failing to sufficiently investigate and evaluate the cause of  Plaintiff Crystal Sun's's symptoms and complaints; and

k.      failing to conduct serum trough levels for levetiracetam and Lamictal in light of the reported overdose symptoms (e.g. ataxia, dysphagia);

l.      negligently (abruptly) stopping all epilepsy medications on 1/16/08 (Dr. Dure only);

m.      misreading the MRI of 8/27/07 (as to Dr. Martin and Pediatric Radiology Associates, P.C.);[9] and

n.      otherwise, in general,  negligently failing to comply with the standard of care applicable to the examination and treatment of Plaintiff Crystal Sun.

---

[9] This is the only count/claim of negligence asserted against Dr. Martin (the radiologist) and Pediatric Radiology Associates, P.C..

68.     In light of the above, the physician defendants are liable for, and Plaintiffs hereby seek to collect, all special and general damages stemming from or associated with the injuries and damages described above including, without limitation, all of Plaintiff Crystal Sun's past and future medical expenses, past and future loss of income, physical disability, permanent scarring and disfigurement, past and future physical and mental pain and suffering, past and future anguish and emotional distress.

WHEREFORE, Plaintiffs demands judgment against Defendants, jointly and severally, for general, special and compensatory damages in amounts well in excess of $75,000.00, for all interest allowed by law, for costs of this action, and for such additional relief as this Court might deem appropriate.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

RESPECTFULLY SUBMITTED this ____day of June, 2011.

/s/ *Daniel B. Feldman*
Daniel B. Feldman (ASB 3787-E63D)
LEWIS, FELDMAN, LEHANE & MCATEE, L.L.C.
2100 Third Avenue North
Suite 810
Birmingham, Alabama 35203
(205) 254-3927
dfeldman@lewis-attorneys.com

/s/ *David Randolph Smith*
David Randolph Smith (to be admitted pro hac vice)
DAVID RANDOLPH SMITH & ASSOCIATES
1913 21ST Avenue South
Nashville, Tennessee 37212
(615) 742-1775
drs@drslawfirm.com

**Attorneys for Plaintiffs**